IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHERIE DANTONE, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:17-cv-454-LY |
| APOCELL, INC. | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT APOCELL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Cherie Dantone ("Plaintiff") files this response to Defendant Apocell, Inc.'s ("the Company" or "Apocell") Motion for Partial Summary Judgment (Doc No. 14) and respectfully requests that this Court deny Defendant's Motion for the following reasons.

## I.      INTRODUCTION

Plaintiff Cherie Dantone is a female PhD who worked successfully for Apocell for her entire professional career until she told her male supervisor, CEO Dr. Darren Davis ("Davis"), that she was pregnant and asked to plan her maternity leave.  Once Dantone did that, Dr. Davis marginalized her, ignored her requests for pregnancy leave, withheld her commissions, and fired her without warning.  This response addresses her claims of pregnancy discrimination.

## II.      STATEMENT OF FACTS

Dantone was a member of the Business Development ("BD") group / team at Apocell. Deposition of Darren Davis ("Davis Depo") at 17:22-18:16.[1]  The overall goal of the BD team is

---

[1] Davis hired Dantone in March 2009.  Davis Depo 15:1-8.  Dantone was a respected, hard worker who was dedicated to Apocell's success.  Davis Depo 17:1-9.  Dantone exhibited good job performance during her entire time at Apocell and was never disciplined for poor performance and never received a negative performance review.  Davis Depo 17:10-18.  Dantone did what was

to drive sales by identifying clients, writing proposals, and closing contracts.  Davis Depo 23:14-24:25.  Dantone's original job description explained that her role was critical to the BD team and she was entitled to commissions on sales.  [Ex 9 - job description - Apocell 118][2]

### A.    Apocell Promotes Dantone in 2014

Dantone was promoted from Technical Applications Scientist to the newly created Director of Scientific Liaison in 2014 and received a $10,000 raise.  Davis Depo 17-21; Declaration of Cherie Dantone ("Dantone Dec") at ¶ 3.  Along with the promotion, Texas was added to her sales territory.  Davis Depo 20:10-21:11; Ex 9 Apocell 84-86, new job description].  Her new job required periodic travel up to 25%.  *Id*.  Dantone was always a commissioned BD team member subject to a commission agreement just like the other team members were.  [Ex 9 - IC agreements] Dantone Dec ¶ 5.  In 2015-2016, Dantone closed new sales in Texas.  Dantone Dec ¶ 6.[3]  Dantone's job was a mix of sales and technical work, not exclusively support tasks.  Dantone Dec ¶ 7.[4]

### B.    Davis Becomes Dantone's Supervisor

In late 2015, Davis demoted and cut the salary of then-BD manager Jane Papadaki, causing her to resign.  Davis Depo 21:9-22:19; Dantone Dec ¶ 8.  Davis then became manager of the BD team and Dantone's direct supervisor.  Davis Depo 17:19-21.  As supervisor. Davis decided which BD members perform which functions.  Davis Depo 25:13-21.

---

asked of her throughout her employment, worked hard, and waited her turn for promotion.  Davis Depo 192:3-14.  Apocell created a fact issue on this by arguing in its Motion for Partial Summary Judgment ("Motion") that Dantone had only a "decent" record as an employee.  Mot.p.8 (Dkt. No. 20).

[2] Dantone was a commissioned salesperson entitled to at least 1% commissions on sales since 2010. Ex. 34; Davis Depo 184:10-15.

[3] Davis disputes this fact.  Mot.p.8. [EX. 9 - AEO commission spreadsheet exhibit]

[4] Davis also disputes this fact.  Mot.p.8.

### C. Dantone Discloses Pregnancy to Davis

On February 17, 2016, Dantone told Davis at the annual BD team meeting that she was pregnant. Davis Depo 28:9-20. Dantone told Davis she was due around September 13, 2016. Dantone Dec ¶ 9. Davis congratulated her but then responded negatively, asking her if she was planning on returning to work afterwards. Dantone Dec ¶ 10. Davis said this in such a way that Dantone understood he reacted negatively to her pregnancy and wrongly assumed she was going to take maternity leave and not return. Dantone Dec ¶ 11. Dantone responded yes, of course she would return to work after maternity leave. Dantone Dec ¶ 12. In this discussion, Davis disclosed he knew Dantone had miscarried the prior year and mentioned a previous employee that recently miscarried twins and needed leave and said to Dantone "you're not as far along as she was." Dantone Dec ¶ 13. Dantone understood this also was a negative comment towards her pregnancy and eventual need for maternity leave. Dantone Dec ¶ 14[5]

### D. Davis Criticizes and Excludes Dantone

After disclosing the pregnancy, Davis treated Dantone differently. Dantone Dec ¶ 14. He began complaining and criticizing her work and nitpicking her—for example asking her if she did work that she had already submitted to him. Dantone Dec ¶ 15.

Davis excluded Dantone from joining the rest of the BD team at the annual American Society of Clinical Oncology (ASCO) conference in 2016. Dantone Dec ¶ 16; Davis Depo 41:12-42:21. Instead, Davis asked Dantone to book the hospitality suite for him and the other male members of the BD team to enjoy at that conference, a secretarial task which Davis never asked Dantone to do in the past. Davis Depo 39:2-16. Dantone Dec ¶ 17. Dantone understood Davis changed his attitude toward her because of her pregnancy. Dantone Dec ¶ 18.

---

[5] Davis disputes that he said any of these negative statements.

### E.      Request for Maternity Leave Begins Termination Process

In 2016, Apocell hired an outside contracting business, EBS, to consult on human resources issues.  Apocell's contact at EBS was representative Amy McGuire.

On May 27, 2016, Dantone emailed Davis to schedule a call to discuss her upcoming maternity leave.  Dantone Dec ¶ 19.  Davis never scheduled that call.  Davis Depo 48:4-13. Instead, Davis responded asking Dantone to send him her commissions plan.  Davis Depo 70:15-24.  Davis told Dantone he was working with McGuire on a new maternity leave policy, but that it was not finalized.  Davis Depo 67:7-13.  Ultimately, there was no change to the policy.  *Id.*

Davis said that McGuire was handling Dantone's maternity leave request, but McGuire testified that her company was hired to make HR recommendations, not perform the HR function. Deposition of Amy McGuire ("McGuire Depo") at 13:13-14:15. Davis does not know whether McGuire or anyone ever responded to Dantone's questions or discussed her maternity leave with her.  Davis Depo 66:7-17.  As far as Davis knew, Dantone's maternity leave was never scheduled, and in fact it was not.  Davis Depo 49:20-50:3; Dantone Dec ¶ 20.  Davis admitted Apocell took no steps to assist Dantone in planning and preparing for pregnancy leave other than whatever steps McGuire took.  Davis Depo 8:11-11:23. McGuire testified that all she did to assist Dantone was review Apocell's policies and inquire with the insurance agent to clarify short term disability benefits applied.  McGuire Depo 5:23-6:10; 26:14-27:5.

On May 31, Davis asked for and Dantone listed her job duties, and said in her email response that her plan was to "work until I go into labor assuming no complication," and again requested to set up a time to discuss specifics on maternity leave.  Davis Depo 51:17-52:3; Ex. 1. Davis testified the reason he asked Dantone for her job duties was to transition them for her maternity leave and no other purpose.  Davis Depo 53:6-54:24. That same afternoon Davis asked Apocell Controller Jan Lawler to find out from McGuire whether Apocell's disability policy covers

4

salary for maternity/child birth/recovery.  Ex. 54.  Deposition of Jan Lawler ("Lawler Depo") at 53:5-22.

### F.     Davis Makes Decision to Terminate Dantone the Day After She Requests Maternity Leave Plan

The next morning, June 1, 2016, Davis met with the Executive Committee and fired Dantone.  Dantone's "position was deemed not critical to the business . . . and the decision was made to eliminate Ms. Dantone's position effective July 1, 2016…[this] decision was made on June 1, 2016."  Davis Depo Ex. 13, Dantone 00130.  Davis and Apocell witnesses testified and represented multiple times that the decision to include Dantone in a reduction in force ("RIF") was final as of June 1.[6]  However, Apocell contends in its Motion that the decision was not final on June 1.

### G.     Conflicting Testimony on When RIF Decision was Made and Who Made it

There are significant conflicting facts regarding when the decision was made to terminate Dantone.  That is because Davis changed his testimony on this fact during his deposition.  Before he conceded that the decision to terminate Dantone was made June 1, he first testified that there were no final decisions on June 1, only continued considerations and nothing finalized regarding whether to include Dantone in a RIF.  Davis Depo 60:7-61:22. He also testified that on June 1,

---

[6] Davis told the EEOC: "On June 1, 2016 a board meeting was held, and it was then determined that the charging party's position would be eliminated…" Davis Depo Ex. 12, Dantone 00116, 119. Davis and Apocell Board Member David McWilliams both testified at deposition that the decision was made to RIF Dantone in the June 1 meeting and that Rick Ryan was in that meeting. Deposition of David McWilliams ("McWilliams Depo") at 53:19 - 55:10; Davis Depo 55:9-22. McWilliams told the EEOC "it was determined" that Dantone's position would be eliminated on June 1.  Davis Depo Ex. 12, Dantone 120.  McWilliams confirmed under oath that this was accurate.  McWilliams Depo 56:22-25.  Lawler also told the EEOC that this decision was made on June 1.  Davis Ex. 12, Dantone 000118.

"there was no final decision made about anyone at this stage."  Davis Depo 151:17-20; 136:2-9 (decision not final on June 1).[7]

Furthermore, Davis could not recall who proposed including Dantone in the RIF, and Apocell has never explained who did so.  Davis Depo 62:7-20.  There is no record of these critical facts because there was no agenda, no minutes, and although Lawler claims to have taken contemporaneous notes of the meeting, she shredded them.  Lawler Depo 11:2-12:5.

### H.     Davis Ignores McGuire's Warning of Pregnancy Discrimination

Later that week, at the ASCO conference, Davis met and discussed hiring a new male contractor into the BD group.  Davis Depo 160:2-164:13; [Ex. 9 -  Apocell 181].  After that, on June 8, Davis first told McGuire about the potential for terminating Dantone.  McGuire Depo 6:25-7.  At that time Davis told McGuire there was no final decision.  McGuire Depo 7:7-8:6. McGuire recommended that Davis "not terminate a pregnant employee."  McGuire Depo 8:7-19.  McGuire testified that as a result, she and Davis agreed on June 8 that "Apocell would wait until she gave birth, and at that point the discussion was left off at that point."  McGuire Depo 8:7-23.  McGuire understood the decision was on hold at that time.  McGuire Depo 34:4-35:16.

Yet, Davis reviewed a report the next day, June 9, that projected terminating Dantone in August, the month before her due date.  Davis Depo 155:7-157:20. This timing was also proposed

---

[7] McWilliams, contrary to his statement to the EEOC, also changed this timeline at deposition: that only a recommendation not a decision was made on June 1, and that the decision was made later, on June 14.  McWilliams Depo 12:15-13:23.  Apocell's answers to interrogatories tell yet a slightly different story, stating: "[a] preliminary decision as to the reduction in force was made June 1, 2016, between Darren Davis, David McWilliams, and Rick Ryan (all Board members), identifying the positions for the potential RIF, and the final decision was made June 14, 2016, by the Board of Directors."  [Defendant's Answers to Interrogatories, No. 7, ex11].  These sworn answers are contradicted by Rick Ryan, who was in the June 1 meeting, emailing Davis a response on June 14 asking which BD person Davis proposed to eliminate.  McWilliams Depo Ex. 18. Neither Davis, McWilliams, or Lawler could explain how Ryan would not know this was Dantone. McWilliams Depo 53:19 - 55:10; Davis Depo 55:9-22; Lawler Depo 64:6-21.

in the report circulated on June 13.  Davis has no explanation for why August was selected as the proposed timeframe here.  Davis Depo 156:6-25.  As late as June 24, McGuire was not aware whether a final decision was made regarding Dantone.  McGuire Depo 32:1-33:6.

On June 27, at least 13 days after the decision was made, Davis told McGuire "that the board has made a decision that they could not wait till after Cherie gave birth, that we needed to move forward with the three RIFs that we originally talked about for financial reasons."  McGuire Depo 33:11-23.  Having been overruled, McGuire then recommended that all three employees in question "needed to be terminated in one set RIF." McGuire Depo 9:21-10:2.

## I.      There Was Not One Set RIF

On July 1, Davis and McGuire called Dantone out of the blue and told her without any prior notice that her employment was terminated, effective immediately.  Davis Depo 73:5-19; 116:18-117:4.  On that same call, Davis and McGuire offered Dantone a severance agreement with a waiver of claim and a part-time temporary position with no health benefits, no ability to earn commission, and no guaranteed hours. [Ex. - 10].  According to Davis, "we wanted to keep her onboard part-time."  Davis Depo 74:12-22.  Davis said this part time position would be "mutually beneficial."  Dantone Dec ¶ 21.  Davis testified that the proposed part-time position was "fair deal," even though it did not provide set hours, pay, or health benefits for Dantone, who was pregnant and who's family was on Apocell's health benefits.  Davis Depo 86:18-87:3; Dantone Dec ¶ 22.  Davis testified that Apocell was ready and willing to accommodate Dantone's maternity leave— by offering her this part time job after terminating her employment.  Davis Depo 191:11-24.  This part-time "job" was apparently created only for Dantone—Apocell did not offer it to anyone else, post it online, or post it on job banks or its website.  Davis Depo 87:7-88:13; McGuire Depo 62:1-7.

Davis also testified he told Dantone she was not the only one in RIF because other employees were being laid off that same day. Davis Depo 74:23-75:18. Davis admits that was false—the other affected department, R&D, was not eliminated until July 11, a week and a half later. Davis Depo 184:16-186:9[8]; McGuire Depo 48:15-22.

### J.      Apocell Denies Dantone PTO Contrary to Its Agreements and Policy

Dantone's employment agreement states she is entitled to be paid PTO upon termination unless it occurs for cause. [Ex 9 - job offer]. Similarly, Apocell's handbook in effect at the time stated "[s]hould employment end, Apocell reserves the right to not pay out any unused PTO balances in cases where an employee does not leave on good terms." Davis Depo 189:18-190:5; Ex. 5. Davis admits Dantone left on good terms. *Id.* She was not fired for cause. She had an approved vacation planned for the days immediately following her termination. Dantone Dec ¶ 23. Dantone had unused PTO, but Apocell contradicted its own agreement and handbook and did not pay it to her. Dantone Dec ¶ 24.[9]

### K.      Davis Pressures Dantone to Sign Severance and Agree to Part Time Offer with No Benefits While Pregnant

Apocell then pressured Dantone to agree to the severance, waive her claim, and take the temporary part time position without benefits. Dantone Dec ¶ 25; Ex. 29; McGuire Depo 57:9-58:1. If Dantone did not sign the proposed severance, her subsidized health care benefits would expire before the baby was due. Davis Depo 194:18-195:1.

---

[8] Davis shifted his testimony on this issue during his deposition.
[9] Davis contends this PTO policy was no longer in place at the time of the RIF, but there was no other applicable written policy—a new handbook was not finalized or published before July 1.

### L.       Davis Treats Dantone and R&D Differently

Apocell was long considering reducing the underperforming ApoStream R&D group.[10] That group included two male employees, Hasegawa and Gupta.[11]  Leading up to and including June 1, Lawler sent multiple budget scenarios to Davis including projections reducing R&D, but none that included reducing Dantone.  Lawler Depo 31:11:25.[12]  The first time Lawler included Dantone on a RIF budget projection was on June 8.  Lawler Depo 36:8-37:2.

The draft severance agreements for Hasegawa and Gupta included set severance amounts, but not Dantone.  Davis Depo 172:1-9.  [Ex. 9].  Davis admits he calculated Dantone's proposed severance differently than Gupta and Hasegawa's.  Davis Depo 83:6-22.  He offered Dantone approximately twice as much severance pay in exchange for the waiver as them.  [Ex. 9 final severance agreements].  Davis also increased Dantone's proposed part time hourly pay rate between the draft of the proposal and the final proposal but did not raise Gupta's or Hasegawa's. McGuire Depo 40:7-20, Ex. 23, 46; Davis Depo 170:10-171:5.

### M.       Illogical to Include Dantone Based on Financial Goals

The alleged financial "crisis" was not unique to June 2016.[13]  According to its own Motion, Apocell lost more money in 2014 and 2015 than in 2016.[14]  And, Lawler said the company is still

---

[10] Apocell contends ApoStream was "the company's highly-valued medical product."  Mot.p.12. To the contrary, Apocell "had no clinical applications" for the ApoStream unit and Apocell "just made the decision to suspend all basic activities on the instrument," and the company has not picked up the ApoStream instrument for additional research and development since the RIF. McWilliams Depo 19:4-23:20.

[11] Hasegawa was already working reduced hours before the RIF.  Dantone Dec ¶ 26.

[12] As late as the afternoon prior to the June 1 meeting, Lawler sent Davis two budget scenarios with R&D reduced but neither considered Dantone or anyone from the BD team.  Ex. 49; Lawler Depo 32:7-35:21.

[13] Although Apocell contends it "hovered on the edge of bankruptcy," Mot. p. 11., at the time it had a $2 million line of credit of which it tapped only a quarter.  Lawler Depo 54:1-57:13.

[14] Defendant concedes the "financial problem had been on-going for some years.  Since at least 2009, Apocell had been losing money."  Mot.p.10.  And yet it is undisputed that Apocell promoted

in "crisis" today, nearly two years later.  Lawler Depo 6:25-7:14. But, this crisis has not resulted in another emergency RIF.  Lawler Depo 85:19-86:7.  Apocell has no evidence of any specific financial or numbers target for the July RIF.[15]  The closest evidence is Lawler testimony that Jennings instructed her in June not to let cash fall below $250,000.  Lawler Depo 67:4-69:16; Ex. 55.  But at the time of the RIF, Apocell had $337,581 in cash.  Lawler Depo 70:24-71:12.  Apocell did not need to RIF Dantone to meet a cash requirement at that time.  Lawler Depo 38:10-23.

### N.     Davis Applied Subjective RIF Criteria to Dantone

The only criteria Apocell claims it used for the RIF was to review job titles and "if they played a support role."  Davis Depo 65:17-22.  Apocell does not explain how simply reviewing an employee's job title, as compared to a job description or a list of actual job tasks, would allow for a non-subjective analysis of their position.  Apocell also ignored standard criteria such as length of service, job performance, or even rate of pay.  Davis Depo 65:23-66:3.  Instead, Apocell relied on Davis's subjective decision to select Dantone because according to him, "she played a support role."  Davis Depo 136:16-21.  However, Davis admits Dantone was a commissioned BD Team member and had responsibility for all the sales territory in Texas.  Davis Depo 138:2-4; 192:15-193:9.[16]  Apocell's documents show Dantone made more in commission than her sales coworker in the last quarter of 2015.  [Ex. 9 - Apocell 594-95].

_____

Dantone during those seven years, only finding her position unnecessary after she told Davis she was pregnant and requested maternity leave.

[15] Apocell argues it had to "reduce headcount by three people," but that is not supported by any contemporaneous documentation and conflicts with deposition testimony.  Also, Apocell did no financial analysis on the part time positions, those were not even budgeted at all.  Lawler Depo 72:1-22.

[16] Davis testified Dantone told him she "didn't want to do sales," but that was in 2009 when she first started, nearly seven years before he terminated her.  Davis Depo 138:2-21.  Davis swore Dantone never traveled to the East or West Coasts for sales presentations.  Mot.p.7.  That is a disputed fact.  Dantone had traveled with Davis to the East Coast and traveled to the West Coast to handle sales presentations and conferences.  Dantone Dec ¶ 28.  Dantone's latest job description,

### O.    Apocell Planned to Increase, Not Reduce, BD Team

Unlike R&D which did not generate money, BD team sales were trending up for the two weeks preceding the June 1 decision and some recent closed deals were "perfectly timed." Lawler Depo 49:21-51:6; Ex. 53. Billing and sample kits were increasing, meaning increased profits. Lawler Depo 51:7-52:19. On June 14, before voting on the final RIF decision, Davis sent a business strategy overview presentation to the Board that included a slide regarding the BD team which stated "beef up sales offering and the team" and suggested firing Dantone and hiring consultants for the BD team. Ex. 40 to McWilliams Depo; McWilliams Depo 50:8-53:22.[17]

### P.    Comparators Not Considered or Selected

Dantone was on the BD team with two male members who had not requested paternity leave, Louis Sintasath and Fawad Faruqi. Davis Depo 108:5-9. Davis gave Faruqi a promotion with a raise from $110,000 to $125,000 salary on Feb 1, 2016. [Ex. 9 - Apocell 795]. Davis hired Sintasath in February and offered to pay him $140,000, a $5,000 sign-on bonus, additional goal-based bonus, and stock options. Davis Depo 26:14-23; [Ex. 9 - Apocell 835-841.] He was the newest member of the BD team in July 2016.

Dantone trained Sintasath how to do some of his job. Davis Depo 108:10-17; Dantone Dec ¶ 27. But Sintasath had "performance issues" including "problems performing his sales function."

---

signed by Davis, had a 25% travel requirement. Ex. 30; Davis Depo 179:10-180:5. Davis also contends Dantone told him she did not want to work in the lab, but that conversation occurred no later than 2015, not as part of the RIF discussion. Davis Depo 129:21-130:7.

[17] McWilliams admitted the intent was: "to improve the quality of our team and the effectiveness of our team . . . getting better qualified people in various spots, sales spots." McWilliams Depo 52:7-22. McWilliams and Lawler also confirmed that Apocell was trying to sell the business at this time. McWilliams Depo 42:1-18; Lawler 17:18:19:10. The revenue line was around $5 million at the time, but it appears the sale price target was $60 million. *Id.* [Ex 7 – June 1 meeting notes]. Lawler confirmed that Jennings instructed Davis in the June 14 meeting to "find a buyer" for the business. Lawler Depo 69:17-70:4.

Davis 103:1-24.  Apocell wrote Sintasath up three separate times for poor performance during his short time at Apocell, and eventually terminated him for poor performance.  Davis Depo 104:4-105:20.[18]  Yet, Davis never considered Sintasath for the RIF instead of Dantone.[19]  After terminating Dantone, Apocell transitioned her tasks to Faruqi.  McGuire Depo 5-16.

### Q.     Apocell Has No Policies or Training to Prevent Pregnancy Discrimination

Apocell conducted no training for employees on pregnancy discrimination, pregnancy accommodation, or pregnancy leave requests, and Davis received no training on these issues.  Davis Depo 101:3-102:25.[20]  Davis was not aware of any company policy on accommodating or responding to requests related to pregnancy other than granting disability leave.  Davis Depo 99:13-24.  There were at least six other employees who at some point notified the Company they were pregnant, but not even one is still at the Company today.  Davis Depo 29:11-30:22.

## III.     ARGUMENT

### A.     Prima Facie Case

Defendant does not dispute most elements of the prima facie case—that Dantone was pregnant at the time she was terminated, she was qualified for her position at that time, meeting expectations at that time, and was terminated while pregnant.[21]  Defendant disputes whether

---

[18] Even McWilliams knew Sintasath "was not a strong performer." McWilliams Depo 23:21-24:10.
[19] Lawler never ran a projection reducing him or Faruqi and re-assigning their duties to Dantone. Lawler Depo 84:2-22.
[20] McGuire also received no training at EBS on these issues. McGuire Depo 19:23-20:4.  None of the decisionmakers received training regarding pregnancy discrimination.  McWilliams Depo 24:11-24.
[21] Plaintiff is no longer pursuing her claim for disability discrimination under the ADAAA and Chapter 21 of the Texas Labor Code.

Pregnancy was a factor in Apocell's termination decision.[22]  For the reasons set forth in more detail above and below and incorporated by reference here, it was.

### B.      Apocell Failed to Articulate a Legitimate Non-Discriminatory Reason for Terminating Plaintiff's Employment When It Did

It is Defendant's burden under *McDonnell Douglas* to articulate a legitimate non-discriminatory reason for the employee's termination with "sufficient clarity" to allow the employee to show pretext.  *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004); *see also See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981). The employer's "legitimate nondiscriminatory reason" requires a showing not just that there was a RIF, but that there was a nondiscriminatory reason why the plaintiff was selected for it.  *See Diaz v. Eagle Produce L.P.*, 521 F.3d 1201, 1211 (9th Cir. 2008) ("To suffice under *McDonnell Douglas*, an employer's explanation must explain why the plaintiff 'in particular' was laid off.").  In this case, Apocell failed to articulate its legitimate, non-discriminatory reason for including Plaintiff in the RIF of the R&D team of which she was not a member.  Defendant argues she was included because she was in a "support role," but that is not a legitimate reason because the R&D team were researchers, and Dantone was a Director and BD team commissioned salesperson.

---

[22] The standard for the final element of the *prima facie* case is not as inflexible as Defendant, citing to *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998), suggests.  Courts regularly find plaintiffs meet the *prima facie* case standard with facts that suggest pretext and that pregnancy may have been a factor in the decision.  *See Starnes v. Wallace*, 849 F.3d 627 (5th Cir. 2017) (rejecting a mechanical application of *McDonnell Douglas* and finding pretext evidence is relevant at the *prima facie* case stage)*; Gerdin v. Ceva Freight, LLC,* 908 F. Supp. 2d 821, 827-28 (S.D. Tex. 2012) *(citing McLaughlin v. W & T Offshore, Inc.*, 78 Fed. Appx. 334, 338 (5th Cir. 2003) (per curiam) (*prima facie* case established by showing that plaintiff was pregnant, discharged following return from maternity leave, and her duties were delegated to two nonpregnant employees)).  A separate, rigid analysis is not required for this element.

### C.     Pretext

If Apocell articulated a legitimate, non-discriminatory reason, the analysis moves to whether that reason is pretext for pregnancy discrimination.  In the last step of the analysis, Plaintiff has the burden to produce "substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id*. at 579 (internal quotations and citations omitted). "An explanation is false or unworthy of credence," and thus pretextual, "if it is not the real reason for the adverse employment action." *Id*. at 578.  Plaintiff can show a reason is not the real reason by showing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's reason.  *U.S. ex rel. Sharp v. Eastern Okla. Orthopedic Ctr*. 2013 U.S. Dist. LEXIS 154646, at *44-45 (N.D. Okla. Oct. 29, 2013) (quoting *Tabor v. Hilti, Inc*., 703 F.3d 1206, 1218 (10th Cir. 2013)); *see also Kakeh v. United Planning Org., Inc.*, 536 F. Supp. 2d 65, 74 (Dist. D.C. February 27, 2008) (mem. op.) (denying summary judgment due in part to "inconsistencies between Defendant's explanation that Plaintiff's termination was a result of the reduction-in-force and other evidence in the record").[23]

---

[23] Like any other termination, a RIF cannot be used as pretext to discriminate.  *See, e.g.*, *Matthews v. Commonwealth Edison*, 128 F.3d 1194, 1195 (7th Cir. 1997) ("Even if the employer has a compelling reason wholly unrelated to the [protected class] of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of [the protected class of] workers"); *see also Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003, *appeal denied*) ("[T]he general financial situation of an employer is often a factor in personnel decisions, but it does not immunize the employer from the statutory obligation to make those decisions in a non-discriminatory manner. Ordinarily, economic downturns and shakeups provide an employer great latitude in making personnel decisions. However, Congress refuses to afford an employer at any time—economically fortuitous or economically disastrous—the right to discriminate on the basis of sex.") (internal quotes and citation omitted).

Evidence of pretext may take a variety of forms, and courts can combine multiple independently insufficient pretextual facts to find pretext sufficient to deny summary judgment. *Laxton*, 333 F.3d at 583; *see also Bosque v. Starr Cnty., Tex.*, 630 F. App'x 300, 304–05 (5th Cir. 2015) (explaining that attempting to cabin pretext evidence is contrary to precedent and commonsense). For example, "[c]lose timing between an employee's protected activity and an adverse action" may "satisfy the causal connection element," but is not always independently sufficient. *Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (internal quotations omitted). However, combining that with "an employer's departure from typical policies and procedures" can bolster an inference of pretext. *Id.* at 455.

### 1. Temporal Proximity, Lack of Documentation, and Departure from Company Policy

Close temporal proximity combined with a lack of documentation or plan for inclusion in a RIF are sufficient to find pretext.[24]

---

[24] *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir.1999) ("The combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment'"); *Burton v. Freescale*, 798 F.3d at 239-40 (5th Cir. 2015) (holding that lack of documentation may be evidence of pretext); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594-95 (6th Cir. 2006) (plaintiff fired two months after disclosure of pregnancy); *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 367–68 (8th Cir. 1987), *cert. denied*, 488 U.S. 1004 (1989) (in valid RIF employer usually has "some kind of plan to reduce expenses by eliminating jobs," which plans "generally include objective criteria by which to determine which jobs will be eliminated"); *Bateman v. American Airlines, Inc.*, 614 F. Supp. 2d 660, 677-78 (E.D. Va. 2009) (employer failed to submit documentation that RIF was preplanned, deliberate action; "lack of RIF-related documentation calls [employer's] non-pretextual reasoning into question."); *Stenberg v. I.C. Sys., Inc.*, No. 07-4064, 2009 U.S. Dist. LEXIS 45441, at *19 (D. Minn. May 29, 2009) (lack of written documentation can support plaintiff 's prima facie case). Defendant relies on *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016) to argue that temporal proximity standing along is insufficient, but unlike the single given reason and plethora of pretext here in additional to temporal proximity, the record in *Fairchild* was "'replete' with legitimate, non-discriminatory reasons for Fairchild's termination: her contentious relationship with her manager; the problems she caused regarding store morale and customer service; and her repeated performance-related problems that resulted in warnings – all of which plaintiff failed to rebut, relying solely on evidence of temporal proximity. *Id.* at 967-68.

Here, Davis made the decision to terminate within hours of Dantone's request to him for maternity leave.  And, there was no documentation of this decision: no written list of business reasons for RIF; no written selection criteria or guidelines; no written selection procedures or decision-makers; no determination of the decision sequence or persons responsible for selecting employees to be included in the reduction in force; no consideration given to requiring the layoff decision to be reviewed by human resources before it was made;[25] no assurance that RIF policies were followed; no assurance that the RIF was not discriminatory; and no written identification of unneeded functions.  This raises at least a fact question as to whether Davis's decision was motivated by Dantone's pregnancy or maternity leave request.  Lawler Depo 22:12-19.

## 2.      Defendant's Key Witnesses Contradicted Themselves on Timing.

Conflicting timing on the decision to include an employee in a RIF can be strong evidence of pretext.  *See Bateman*, 614 F. Supp. 2d at 678 (denying summary judgment where the record showed discrepancies as to when and why employer first considered terminating plaintiff as part of RIF).  Also, an employer's rationale is "suspect" where the employer changed its story between the time of the EEOC's investigation and the ultimate litigation.  *Burton*, 798 F.3d at 237 (internal quotations omitted).  Here, there is direct contradictory testimony in Defendant's explanation about when the decision was made to include Plaintiff in the RIF.  Davis changed his testimony on this issue during his deposition following a break during which he met with counsel.[26]  Because

---

[25] McGuire Depo 29:7-30:1.

[26] Davis and McWilliams told the EEOC that the decision to include Dantone in the RIF was final on June 1, and then testified in litigation that it was not final on June 1.  Apocell contends in litigation that the decision was not final June 1, that instead it "had a mandate" to look for "possible solutions" for the "serious financial problems" and that the final decision was made June 14.  Mot. pp. 12, 15.  If the final decision was on June 1, it was only hours after Dantone requested that Davis schedule her maternity leave and before any financial analysis or budgeting was conducted that purported to include Dantone in the RIF.  If the final decision was June 14, it was after HR

the timing of plaintiff's inclusion in the RIF is a critical fact disputed by Apocell's key witnesses'

own testimony, summary judgment should be denied on this basis alone.

Additionally, because the Board was a rubber stamp and there are no documents that

explain his decision, Apocell's entire case relies on Davis's credibility.[27]   Credibility must be

determined by a jury.  Here, a jury has multiple reasons to doubt Davis's credibility.  For example,

as discussed earlier, Davis gave conflicting testimony about when the ultimate termination

decision at issue in this case was made.[28]   Also, as another example, Davis testified he did not

know if a June 2016 business strategy slide stating "reduce one BD FTE" was discussing Dantone

or not.  Davis Depo 164:6-10.  The email he wrote attaching the slides confirms he did know.[29]

### 3.    Davis's Negative Statements About Pregnancy

An oral statement exhibiting discriminatory animus may be used to demonstrate pretext

*Russell v. McKinney Hospital Venture*, 235 F.3d 219, 225-26 (5th Cir. 2000).  Here, Dantone

testifies that Davis made multiple negative statements about her pregnancy, asking her if she was

---

told Davis on June 8 not to include Dantone because it would likely be discriminatory, which he
disregarded.

[27] McWilliams Depo 16:1-18:25; 57:24-58:9; 58:10-15; *Good v. Ask Jeeves, Inc.* 2004 WL
2203248 at *8. (N.D. Tex. Sep. 30, 2014) (denying summary judgment on employment claims
because whether Ask Jeeves's articulated reason is false turns on the credibility of witnesses, which
necessarily raises a genuine issue of material fact.)

[28] He testified repeatedly that no final decision was made in the June 1 meeting about the RIF, but
after a break, returned to the deposition to "clarify" that at "[t]he meeting on June 1, there was a
decision made to implement a RIF with . . . Cherie . . . that was the decision that was made at that
time."  Davis Depo 149:13-155:6.  Davis also contends he asked Dantone to send him her list of
tasks they day before June 1 because he was planning for her maternity leave.  Mot.p.9.  Why
Davis would plan for Dantone's long-term well-being one day, and fire her the next day, is a fact
question for the jury.  Whether this timing is actually a coincidence, as Apocell argues it is, presents
a material fact dispute.

[29] In the email, Board Member Rick Ryan asks: "Which BD person are you proposing to elim,"
and Davis responds "Cherie Dantone."  [Ex. 9 - Apocell 175-176.]

planning to return to work, discussing miscarriages, and suggesting part time work would be mutually beneficial for her while she was pregnant.  These are additional evidence of pretext.

### 4.      Davis's RIF Decision Lacked Any Non-Subjective Criteria

Subjective criteria can be evidence of pretext.  *See Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980) (while subjective criteria "may serve legitimate functions, they also provide opportunities for unlawful discrimination").  Here, Davis singlehandedly decided which people were in a "support" role, with no definition of what a support role is and no way to measure if a position met the definition.[30]  This shows a total lack of objective standards and leads to a process highly susceptible to abuse.

There was no identification of unneeded functions without reference to individuals currently occupying the affected positions, no evaluation of all incumbents at Apocell where only some were laid off, no candor in the method to assure fairness in selections, no method for assuring fairness in selections, no consideration of less burdensome alternatives nor evidence of rejection of those alternatives on a consistent and reasoned basis, and no attempt to cushion the blow—the RIF was effective immediately once Apocell informed Dantone.

### 5.      Apocell's Decision Makes No Sense Given the Circumstances.

An employment decision that is illogical can be evidence of pretext.[31]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is

---

[30] Everyone in the meeting knew the people they were discussing by name, which means Davis picked Dantone out and essentially fired her individually.  Lawler Depo 22:12-19.
[31] *See e.g., Young v. United Parcel Serv., Inc*., 135 S. Ct. 1338, 1356 (2015) (Alito, J., concurring) ("when an employer claims to have made a decision for a reason that does not seem to make sense, a factfinder may infer that the employer's asserted reason for its action is a pretext for unlawful discrimination.").

unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

Apocell fired a pregnant director in sales while sales were increasing, while it was actively courting a new male sales consultant, while the newly-hired male sales director making twice as much was underperforming,[32] while it proposed "beefing up" its sales team, shortly after it gave a male salesperson a raise, and at a time when it was already ahead of its cash targets.[33]  There is pretext where there is not one set RIF: Dantone and the R&D team were considered for inclusion at different times, terminated at a different times, and offered different severance packages.  Davis Depo 75:4-76:4.[34]  There is pretext where Apocell's own HR rep told them this decision was potentially discriminatory, and Apocell went ahead regardless and made a final decision without HR first reviewing it.  There is pretext where Davis asked his pregnant subordinate Dantone if she planned to return to work after maternity, disregarded her request to plan her pregnancy leave, did not respond to it, and the day after she requested to plan maternity leave decided to terminate her.[35]

It is pretext where the RIF decision was purportedly for immediate financial reasons, but the part time offer to Dantone that Davis contends could have paid as much as her job was inexplicably not present in any of the RIF budget forecasts.[36]  If the goal really was always to

---

[32] Apocell has not proffered a legitimate reason why Plaintiff was chosen for reduction instead of her BD team commissioned salesperson colleague Sintasath, who Dantone trained in part, who exhibited poor performance, and who was paid nearly twice as much as Dantone.

[33] Apocell had $337,581 in cash but had a target of only $250,000.  According to Apocell's own evidence, they were so far ahead of their own cash target at the time they fired Dantone that they could have instead hired Dantone 10 times over (at $8,000 per month) and still made their cash goal.

[34] *See Gerner v. County of Chesterfield, Va.*, 674 F. 3d 264, 267-68 (4th Cir. 2012) (discriminatory severance offer can be adverse employment action all by itself).

[35] *See e.g., Asmo*, 471 F.3d at 594-95 (when plaintiff announced she was having twins, all her co-workers made a fuss while supervisor was notably silent both at the time and thereafter).

[36] Davis did, however, consider the costs of health care benefits in the financial analysis as part of the reduction in force.  Davis Depo 184:3-6.

reduce support roles, then why was Dantone's role not on the various pre-June 8 budget forecasts showing reductions only to the R&D group?  The jury needs to decide if the real reason for this action was budgetary or discriminatory.

### 6.    Defendant's Counterpoints Do Not Avoid Material Issues of Fact

Defendant argues Dantone was not replaced, but she was effectively replaced by someone outside the protected class when her duties were reassigned to Faruqi.[37]  Davis contends Dantone did not perform sales, but there is no dispute she was a commissioned salesperson who closed sales in Texas, which is why there is an additional dispute in this matter about Apocell not paying Dantone her 2016 commissions.  And, Davis as supervisor had broad discretion to assign sales among BD team members, meaning if he wanted Dantone to sell more he could simply have assigned her more territory or accounts.  And finally, Defendant holds itself out as a small local operation, but they had a $5 million line of credit, venture capital investment from the East Coast, and have made millions in gross revenue each year.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

---

[37] Courts find such reassignment can support a finding of discrimination.  *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997) (employer "effectively replaced" plaintiff by "reassigning another employee to assume [his] duties"); *Artope v. Center for Animal Care and Control, Inc.*, 2009 WL 874037, at *9 (S.D.N.Y. Mar. 27, 2009) ("even if an employer eliminates a plaintiff 's position, the circumstances may nonetheless give rise to an inference of discrimination if the employer then reassigns the plaintiff 's duties to another employee . . . replacement by someone outside the plaintiff 's protected category is a circumstance that gives rise to an inference of discrimination.").

Respectfully Submitted,

**KAPLAN LAW FIRM, PLLC**
2525 Wallingwood Dr., Bldg. 14
Austin, Texas 78746
Telephone: (512) 553-9390
Telecopier: (512) 692-2788
www.kaplanlawatx.com

By: */s/ Austin Kaplan*

**Austin Kaplan**
State Bar No. 24072176
akaplan@kaplanlawatx.com

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of March 2018, I sent a true and correct copy of the foregoing documents to all counsel of record:

*Via CM/ECF: ajohnson@krcl.com*
Andrea M. Johnson
Kane Russell Coleman Logan PC
5051 Westheimer Road, Suite 1000
Houston, Texas 77056

*Via CM/ECF: deconomou@krcl.com*
Demetri J. Economou
Kane Russell Coleman Logan PC
5051 Westheimer, 10th Floor
Houston, Texas 77056

Austin Kaplan